IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
CASE NO.: 5:18-CV00032-FDW-DSC

_____

                                    )

JANE DOE,                          )
                                    )
             Plaintiff,      )
                                    )
v.                                  )
                                    )
LENOIR-RHYNE UNIVERSITY,    )
                                    )
             Defendant.      )
_____ )


DEPOSITION
OF
KATHRYN FISHER


Taken at:


Bradford Hayes, LLP
1300 Baxter Street, Suite 400
Charlotte, North Carolina


On Friday, February 15, 2019


REPORTER:  CHRISTINE A. TAYLOR, RPR
Notary Public

Exhibit 3 ... 1

1    Pursuant to Notice in the aforementioned matter

2    and in accordance with the Federal Rules of Civil

3    Procedure, this deposition of KATHRYN FISHER was taken by

4    plaintiff beginning at 10:10 a.m. on February 15, 2019

5    before CHRISTINE A. TAYLOR, Registered Professional

6    Reporter and Notary Public.

7          KATHRYN FISHER, called as a witness and upon

8    first being duly sworn, testified as follows:

9          EXAMINATION BY MR. KOBYLINSKI

10   Q.   Dean Fisher, do you mind stating your full name for

11        the record?

12   A.   Yes.  My name is Kathryn Leigh Pattillo Fisher.  I go

13        by Katie.

14   Q.   Could you spell the --

15   A.   K-a-t-h-r-y-n, L-e-i-g-h, P-a-t-t-i-l-l-o,

16        F-i-s-h-e-r.  And Katie is K-a-t-i-e.

17   Q.   You are currently employed at Lenoir-Rhyne University?

18   A.   Yes, I am.

19   Q.   Will it be okay if we just refer to that as LRU for

20        today?

21   A.   That's totally fine.  That's how I would refer to it.

22   Q.   What is your current position?

23   A.   I'm the Assistant Provost to the Dean of Student Life.

24   Q.   How long have you held that position?

25   A.   In August, it will be ten full years in that position.

Case 5:18-cv-00032-DSC  Document 48-3  Filed 05/08/19  Page 2 of 30

Exhibit 3 ...2

1       Do you follow that denomination of the Lutheran

2       faith?

3   A.  I am a member of the Lutheran ELCA, yes, but I don't

4       regularly attend church --

5   Q.  I don't either.  That's okay.

6   A.  -- at the moment.

7   Q.  What are the responsibilities of being a Dean of

8       Student Life?

9   A.  Are you talking about my job description?

10  Q.  Well, yes.

11  A.  Okay.

12  Q.  Let's start with your job description.  How would you

13      describe your job to a stranger on the street?

14  A.  To a stranger, I would say, well, if it's not

15      athletics and it's not academics, I have a lot of

16      purview over those things.  I manage our residence

17      life, our counseling center, our health center, our

18      career development center, our academic success which

19      is basically tutoring, our learning commons which is

20      kind of a set of programs that help students become

21      more academically successful.  But those are kind of

22      the student activities.  Those are the general areas

23      in which -- and student activities has a lot of

24      different things, but that's the general.  I'm the

25      chief student life officer who manages those kind of

1      then I would jump in.

2   Q.  The assistant dean, is that Mr. Rink?

3   A.  Yes.

4   Q.  And Mr. Rink reports to you?

5   A.  Yes.

6   Q.  My understanding is there's resident assistants that

7       are students within the dormitories.  Do they

8       report -- who does an RA report to?  Take me up

9       through the chain of that.

10  A.  The RA will report to an RD.  And RD is a residence

11      director.  Residence directors report to Jonathan Rink

12      who is the assistant dean of students and director of

13      residence life, and then he reports to me.

14  Q.  Okay.  The name of LRU's football team is the Bears?

15  A.  That's the university mascot, the bears.

16  Q.  The bears, okay.  Does the football team have a

17      different name?

18  A.  No.  All our teams are the bears.

19  Q.  I notice that at the bottom of your e-mails you have

20      the term "Go Bears."

21  A.  That's our -- kind of our moniker.  We're like War

22      Eagle if you go to Auburn.  There's -- you know,

23      there's certain chants and things like that.  So Go

24      Bears is kind of our thing.

25  Q.  I notice that on some of your e-mails it didn't seem

Case 5:18-cv-00032-DSC   Document 48-3   Filed 05/08/19   Page 4 of 30
Exhibit 3 ...4

1    Q.   Okay. Was it only Mr. Bruce who communicated these

2         posts to you or did someone else?

3    A.   That's the only person I remember actually.

4    Q.   You mentioned that Mr. Bruce was the freshman class

5         president?

6    A.   He had been elected, yes.

7    Q.   When did that election occur?

8    A.   Sometime in the fall. I don't remember the exact

9         dates but fall of 2014.

10   Q.   And what does one do as the freshman class president?

11        What does that involve? What are the roles?

12        Responsibilities?

13   A.   Right. So the freshman class president is to attend

14        Student Government Association meetings. We have

15        presidents of each of the classes. They are

16        ultimately to come up with the kind of a class

17        project, which is normally something that either

18        enhances the campus culture, a campus what event, or

19        they may end up planning a service project that the

20        freshman class can kind of get behind and move forward

21        doing that together.

22   Q.   Okay. So they attend student government, organize a

23        class project?

24   A.   Uh-huh.

25   Q.   Anything else?

Exhibit 3 ...5

1  A.  That's pretty much it.  Give their input on behalf of

2      the freshman class.

3  Q.  Okay.  Are there any perks of being freshman

4      president?

5  A.  No.  Other than putting it on your resumé.

6  Q.  When Mr. Bruce was suspended, did they have to elect

7      another student class president?

8  A.  Yes.

9  Q.  When would that have occurred, do you recall?

10 A.  That would have occurred very close after this was --

11     his suspension.  It would have been the next week or

12     whenever.

13 Q.  Okay.  And how was the fact that they had have to

14     another election for the student class president

15     communicated -- or the freshman class, how was the

16     fact that they had to have another election for

17     another freshman communicated to the student body?

18 A.  So it would have been told to the student government

19     association that Andrew is no longer going to be

20     providing any service.  He's no longer at school and

21     that was all that was told.  And then they went about

22     and had a student body election -- or not a student

23     body election, a student freshman class election.  And

24     so they sent out, hey, if anybody would like to be the

25     new freshman class president, send your names, and

1      terrible things happened?

2   A.  Well, I would have met him in a student government

3      association meeting when he was elected.

4   Q.  You would have met him, but you don't recall it?

5   A.  I don't recall the date or anything like that, no.

6   Q.  He was on the football team?

7   A.  He was.

8   Q.  So you can't recall if you had a good impression or a

9      bad impression?

10  A.  Not really.

11  Q.  Do you recall the first time you spoke with Mr. Bruce

12     after these allegations had come to light?

13  A.  When they came to light, I had to -- there's a form,

14     judicial grievance form, that has the allegation and

15     that would have been when I would have called him in

16     and said we have to discuss this allegation against

17     you.  And I would have read, basically, the back of

18     the form which talks about the procedures and the

19     rights he has as the respondent of the accusation.

20  Q.  Okay.  How did you first become aware that this had

21     happened between ████████ and Mr. Bruce?

22  A.  I had a phone call.  I was out of town at the time.

23  Q.  About 3:00 in the morning phone call?

24  A.  I don't remember what time it was.

25  Q.  Do you remember who called you?

1  A.   I believe it was Jonathan Rink.

2  Q.   And as best you can remember, what did Mr. Rink

3       explain to you on the phone call?

4  A.   He explained that a student -- at first he didn't use

5       names because we were on a phone call and I don't know

6       where he was standing and I was on a bus somewhere

7       probably.  I was out of town.  So I learned that there

8       had been an incident and that the incident involved a

9       sexual assault.  And, ultimately, I had to ask who it

10      was.  He told me the names of the two individuals,

11      Andrew Bruce and ████████████ that at the time he

12      wanted to make sure he was doing everything right.  I

13      said, well, first, before you do anything, you need to

14      make sure you call in security and security is there.

15      After that I know I would have discussed with him the

16      need to make sure that ████████ being the alleged

17      victim, was safe and that Mr. Bruce, if they think

18      something really went on here, they need to ask a few

19      questions to make sure before they secure the scene,

20      make sure they ask some questions of him.  I was told

21      later, and I don't know how long later, that Andrew

22      had denied having any sexual contact with ████████

23      during the time, and then that Larry Waters, our

24      security officer, ultimately thought let me ask to

25      search the room at which point they found the condoms.

1     And at that point Andrew finally fessed up to having

2     had sex with ██████████

3         My understanding or recollection is that also

4     during the conversation prior to them searching the

5     room and finding condoms, Andrew had maintained for

6     quite sometime, and again the amount of time I'm not

7     100 percent sure, but I know it was probably longer

8     than 20 minutes, that he and ████████ had not had sex

9     because ███████ had been drinking, and that would be

10    wrong.  Because that's wrong, you should not take

11    advantage of somebody who is drinking.  And so based

12    on the fact that he had stalled and tried to say they

13    had not had sex, and then later when the condoms were

14    found was when he decided, okay, yeah, we had sex, and

15    then tried to talk about being consensual and all

16    these things.  That's where the red flags went off in

17    my head going this is a problem, he is not telling the

18    truth.

19        That's just my initial assessment based on that

20    because if he knew that he had had sex with her and

21    that she had been drinking, then that's a problem,

22    so -- at which point I was not happy because I'm never

23    happy about these things.  But at that point I knew we

24    are definitely going to help ██████ to go after him

25    from our Student Conduct because that's the first

Exhibit 3 ...9

1    thing that I have to think of in terms of our campus.

2    I know they also offered for ███████ to be able to talk

3    to the police. And, to my knowledge, she did not want

4    to do that at that time. So that's how I learned

5    about this.

6  Q. Okay. What information was provided to you in that

7    phone call about ████████'s condition?

8  A. That she was very distraught and very upset. That I

9    don't know what was -- I don't know anything else

10    specifically. I know subsequent calls were that Marg

11    Schenk or Marg Shreitah, her athletic trainer, was

12    going to be taking her to the doctor to get her

13    checked out. I believe that was a few days later, but

14    I don't recall the exact date. I thought that's

15    wonderful, she's got somebody who she trusts that we

16    can trust to go with her to make sure she's getting

17    whatever medical care that she needs.

18  Q. Okay. So at that phone call you were made aware that

19    ████████ was intoxicated?

20  A. Yes. But that doesn't matter, no one deserves the

21    right to get hurt like that.

22  Q. I agree. Was anything else about her physical

23    condition described to you?

24  A. No, not at that time.

25  Q. Did someone tell you that she was bleeding?

1    just have to say yes or no.  And then we start the

2    process of setting up the hearings and things like

3    that.  He would have been -- I do recall he was very

4    upset and tried to say he didn't do anything.

5  Q.  Have you had any contact with Andrew Bruce since he

6      was suspended and left the university?

7  A.  Yes.  He has contacted me before.

8  Q.  Okay.  Do you recall the dates?

9  A.  I do not recall the dates.

10  Q.  Can you give me an estimate of when he contacted you?

11  A.  It was at least a year or so after he left the

12     university.  It may have been closer to two years.

13  Q.  What was the purpose of his reaching out to you?

14  A.  He was trying to apply to another school.  And most

15     transfer students, most colleges ask for a dean's

16     reference letter where we have to stipulate whether

17     they've had any kind of action against them from a

18     judicial standpoint.  And so he wanted to know if I

19     could do that letter for him.  I said sure, but I have

20     to tell the truth on the letter of which I did, and he

21     did not get in from what I understand.

22  Q.  So you communicated to whatever school he was going to

23     apply to --

24  A.  He sent me the form saying here's the -- the school

25     wants this information on did I do anything.  And I'm

1     that.

2  Q.  So basically an introduction, not help me with any

3      problems or anything like that?

4  A.  Not the first time, no.

5  Q.  Do you know who ███████████ is?

6  A.  I do.

7  Q.  She was the RA that was involved --

8  A.  She was an RA.

9  Q.  -- in bringing this to light?

10 A.  Yes.

11 Q.  Did you ever speak with ████████ about what had

12     happened?

13 A.  After I got back from wherever I was, yeah.

14 Q.  What information did ████████ provide you?

15 A.  The same information, that ███████ had been in Andrew's

16     room and that he ultimately had sexually assaulted

17     her.

18 Q.  Okay.  Has ███████████ spoke with you about any other

19     sexual assaults that occurred at Lenoir-Rhyne?

20 A.  No.

21 Q.  Do you know if ████████████ indicated she, herself, had

22     been a victim of sexual assault?

23 A.  She has not indicated that to me.

24 Q.  My understanding is Mr. Bruce had a tutor?

25 A.  That, I don't know.

1   expelled, and I think you said no.  I think that was a

2   bad question.  What was the sanction that ████████

3   ████'s assailant was given as a result of the

4   grievance?

5   A.  He was found that he had to go to counseling.

6   Q.  Did you speak with ██████ about the allegations?

7   A.  I did.

8   Q.  Earlier you were kind enough to tell me that you

9   disagreed with the sanction that was handed down to

10  Mr. Bruce.  What were your feelings on the one that

11  was handed down to ████████'s assailant?

12  A.  That one seemed more appropriate given the

13  circumstances that we were made aware of.

14  Q.  Okay.  Did you ever speak about ████████████ with

15  ████████████?

16  A.  Not to my knowledge.

17  Q.  Did you ever speak about Andrew Bruce with ████████

18  ████?

19  A.  No.

20  Q.  What dormitory was ████████████ an RA at?

21  A.  I couldn't tell you.  I do not know.

22  Q.  You have spoken with ██████'s mother, Janet █████;

23  correct?

24  A.  She has called me before, yes.

25  Q.  That's my question.  Was it over the phone or was it

1     in person?

2  A.  I only recall over the phone.

3  Q.  Over the phone, okay.  Do you remember when those

4     conversations over the phone occurred?

5  A.  My only recollection for sure would be after he was

6     suspended.

7  Q.  Okay.

8  A.  After Mr. Bruce was suspended.

9  Q.  Do you recall of that being the last one?

10  A.  I don't recall.  I may have spoken to her maybe twice.

11  Q.  I saw that she sent you an e-mail?

12  A.  Probably.

13  Q.  Do you recall what was discussed during those phone

14     calls --

15  A.  I do not.

16  Q.  -- Dean Fisher?

17  A.  I don't.

18  Q.  When was the first time that you recall speaking to

19     ███████ about the assault after they had made you aware

20     of it over the phone?

21  A.  It would have been after I got back, after the

22     weekend.  I don't know what day or anything like that,

23     but I feel sure I would have had her in my office.

24  Q.  Okay.  Do you have a procedure you follow for this

25     type of scenario?

Case 5:18-cv-00032-DSC  Document 49-3  Filed 05/08/19  Page 14 of 30
Exhibit 3 ...14

1      about those things.  We try to assess whether we're

2      going to need to notify faculty they're going to need

3      to be out for a few days, we may be e-mailing faculty

4      to say, you know, this person is going through some

5      personal issues, please allow them some grace in

6      getting things done.  We offer counseling.  We offer

7      if the police have not or were not, we offer to

8      contact police on their behalf or with them.  I

9      encourage them to do so.  That's kind of where we are.

10     Then we also make sure they understand their rights in

11     terms -- if we haven't already gone through the

12     judicial process, we make sure they understand what

13     the judicial process entails.

14  Q.  Okay.  And do you accomplish all that in a

15     face-to-face meeting with the victim?

16  A.  Most of the time, yes.

17  Q.  And is it your custom to have that face-to-face

18     meeting, just you and the victim?

19  A.  It depends.  If they would like to bring somebody with

20     them, they can.  Depending on the circumstances, I may

21     want to pull in either the director of security or

22     Jonathan Rink because he's usually the one who

23     notified me if there's something that comes to light

24     through his office.

25  Q.  I forget, you told me the name of the Title IX

1      she makes sure that I know that both sides are -- you

2      know, if she gets to the point of telling me who it

3      is.  Usually we have done more on site of what the

4      person who is alleged the Title IX issue that --

5  Q.  The victim?

6  A.  Well, the victim, yeah.

7  Q.  I didn't mean to cut you off.  I apologize.

8  A.  That's quite all right.

9  Q.  What is your understanding of the school's obligations

10     for handling a case where we know there's a sexual

11     assault and the victim doesn't want to pursue either

12     law enforcement or the grievance procedure?

13  A.  So my understanding is that Dawn Floyd, if she gets

14     information alleging some sort of Title IX or sexual

15     assault, I mean there's lots of things under Title IX

16     that are not considered sexual assault.

17  Q.  Right.

18  A.  If the student does not to want to put it in writing,

19     doesn't want to actually pursue it, just wants

20     something to be done, my understanding is that she

21     would do at least a preliminary investigation to make

22     sure that if the person potentially that is being

23     alleged that did something, would -- are they a risk.

24     Is this somebody we need to -- has anyone else already

25     made a claim against them to make sure that we're not

1       talking about something.  Again, it's going to depend

2       on what is alleged.  But she would do a cursory -- at

3       least a cursory, I don't know if that's the right

4       word, but at least some sort of investigation to

5       determine whether there is a safety risk campus for

6       our or not.

7   Q.  Do you recall when that type of program started?

8   A.  I don't recall the exact date, no.

9   Q.  Was it after ████████'s --

10  A.  No.  We actually beforehand if somebody would have

11      come forward and said, hey, so and so did something,

12      but I don't want anybody to know about it, they just

13      kind of allege these things, then we would still go

14      through judicial files and look to see if there's

15      other things that are going on for this person, have

16      they been found responsible for something in the past

17      prior to either my arrival or any time during.  So we

18      would always look to see is there a safety risk going

19      on.

20          I know that there's also in terms of sexual

21      assaults and things like that, there's also Clery

22      reporting that has to be done.  So that would have

23      been reported out if it was an alleged sexual assault

24      to our director of security because he would have to

25      make sure that the reporting is done accurately.

Exhibit 3 ...17

1      sexual assault and a rape?

2   A.   Because I'm not in the room when that occurred, I

3        would have to know more exactly about what exactly

4        happened.

5   Q.   Okay.  I'm not asking you to say whether he raped her

6        or not.  In your mind, is there a difference between

7        sexual assault, having sex with someone who's too

8        drunk to give consent and rape or in your mind are

9        they the same?

10  A.   I would say they're probably the same.

11  Q.   Okay.  Did anyone discuss the possibility of getting a

12       toxicology test done on ███████████ to make sure she

13       hadn't been slipped something?

14  A.   No.

15  Q.   Is there any type of procedure for investigating

16       that --

17  A.   No.

18  Q.   -- in any way if that happens?

19  A.   No.

20  Q.   Some schools have educational programs where they try

21       and teach freshman what the definition of consent is,

22       how you should appropriately obtain consent to move on

23       to have intimate relations.  If you understand what

24       I'm referring to, my question to you will be in the

25       year that ███████ attended LRU, her freshman year, was

1   Q.  If you had been made aware of that, would you have

2       taken any action?

3   A.  Yes, I would have.  We would have enforced our

4       no-contact order.  That's a big problem.

5   Q.  I can see you anticipated my next question there.

6   A.  It's a problem.

7   Q.  Do you believe that the police should have been

8       contacted that morning when the assault was

9       discovered?

10  A.  I don't because we take the lead from the student.

11      Hindsight always could be different, but at the

12      time -- and we still maintain that we encourage

13      students to let us encourage them to call the police

14      too.  They're adults.

15  Q.  Have you ever had any discussions -- you personally --

16  A.  My personally.

17  Q.  Have you ever had any discussions with the Hickory

18      Police Department or the district attorney for Catawba

19      County about how allegations of sexual assault should

20      be handled where the victim doesn't want to press

21      charges?

22  A.  I have not had any conversations with them.

23  Q.  To your knowledge, has anyone at Lenoir-Rhyne spoken

24      to the police department or the district attorney

25      about how to handle situations of sexual assault where

```
 1        the victim doesn't want to press charges?
 2   A.   I do not have knowledge of that.
 3   Q.   Many police departments want to be informed of sexual
 4        assaults even if the victim doesn't come forward.  Are
 5        you aware if the Hickory Police Department is one of
 6        those jurisdictions?
 7   A.   I am not aware.
 8   Q.   To your knowledge, has Lenoir-Rhyne ever attempted to
 9        determine that?
10   A.   I don't know.
11   Q.   Has anyone within Lenoir-Rhyne ever considered the
12        question of whether or not they could be potentially
13        aiding and abetting a crime by not involving the
14        police?
15   A.   I do not know that anybody ever considered that.
16   Q.   Are you familiar with the publication known as the
17        Hickory Daily Record?
18   A.   I am.
19   Q.   What is that publication?
20   A.   It is the local newspaper.
21   Q.   Are you aware that following the assault that happened
22        between ██████ and Mr. Bruce, that assault made
23        the news?
24   A.   I'm aware that an assault made the news.
25   Q.   What was your understanding of the news that had been
```

1      made by the assault?

2  A.  My understanding is that a student who was involved in

3      a different situation had gone to the police on our

4      urging and the Hickory Daily Record picked up on that

5      and that they did a story.

6  Q.  So it's your understanding that what the Hickory Daily

7      Record --

8  A.  Was referencing a different sexual assault alleged

9      sexual assault.

10  Q.  You're not aware that they had mentioned that some of

11      the assaults had not been reported to them?

12  A.  I'm aware that that's part of the article.

13  Q.  That would include --

14  A.  To the Hickory Daily Record.

15  Q.  Yeah.  So my question to you is:  The Hickory Daily

16      had published an article basically saying that

17      Lenoir-Rhyne was not reporting all of the sexual

18      assaults to the Hickory Police Department is my

19      understanding of the article; correct or incorrect?

20  A.  I believe that is -- as far as I remember, that is

21      part of the article, yes.

22  Q.  When that article came out, what actions were taken by

23      Lenoir-Rhyne University about that?

24  A.  My understanding is that our director of security

25      reviewed to make sure that we had all the ones

```
 1        found with alcohol.
 2   Q.   Okay.
 3   A.   So instead of saying it might be this, this, there's
 4        like a Level 1, Level 2, Level 3.  So there's certain
 5        specifics on if you get caught with alcohol the first
 6        time and there's no other mitigating circumstances,
 7        then there's a $50 fine, you go through alcohol
 8        training, basically it's a counseling session to make
 9        sure or two, because we want to make sure the student
10        doesn't have a larger alcohol problem.  Is this a
11        youthful dumb indiscretion or is this somebody with an
12        actual problem because we want to make sure we can
13        keep -- help people get as healthy as they possibly
14        can.
15   Q.   Okay.  One of the documents that was given to me today
16        involved a woman by the name of ███████████?
17   A.   Yes.
18   Q.   Who is ███████████?
19   A.   She was a freshman at Lenoir-Rhyne, but prior to
20        transferring.  I believe she was there the same year
21        that ██████ was there.  I believe she was only there
22        for one year.
23   Q.   You said she transferred.  Do you know where?
24   A.   I think UNCA.  That's where her transfer letter -- her
25        dean's letter was to be sent.
```

1  Q.  Does UNCA mean University of North Carolina Asheville?

2  A.  Yes, it does.  Sorry.

3  Q.  I'm surprised I knew that being a Yankee and all.

4           What were the circumstances in ███████████'s

5      transfer?

6  A.  She indicated she just didn't have a fit at

7      Lenoir-Rhyne at the time when she first asked for the

8      transfer letter.

9  Q.  And the reason I'm bringing her up is it has been

10     represented to me by your counsel that she also made

11     allegations --

12 A.  She did.

13 Q.  -- of a sexual assault?

14           MR. BOLICK:  Just let him finish if you

15      can.

16           THE WITNESS:  Okay.  Thank you.

17           MR. BOLICK:  It's for her.

18           THE WITNESS:  I'm glad you're here.

19 A.  Yes, she did.

20 Q.  Relevant to Mr. Bruce?

21 A.  She did.

22 Q.  What were her specific -- Joe, you want to take a

23     break?

24           MR. HAYES:  Take a break, yeah.

25           MR. KOBYLINSKI:  Yeah.  Let's take a

Exhibit 3 ...23

1      five-minute break.

2         (Recess taken from 12:31 p.m. until 12:50 p.m.)

3   Q.  We were talking about ███████████ before we left.

4       And you had mentioned she transferred to UNCA because

5       she didn't feel she fit and then we started jumping

6       into she had made allegations involving Andrew Bruce

7       as well?

8   A.  She did.

9   Q.  What were allegations?

10  A.  That he acted inappropriately.  She never actually

11      would write down or tell us specifics.

12  Q.  Did she tell you when it happened?

13  A.  She said it happened at the fall semester.

14  Q.  Did she tell you where it happened?

15  A.  No.

16  Q.  Did you press for detail?  Did you ask her what

17      happened?

18  A.  We asked her what happened and we didn't get a lot

19      more.  We asked if she would write it down.

20  Q.  You used the term "we"?

21  A.  Jonathan Rink was in the office or we were in his

22      office.

23  Q.  Why were you in his Jonathan's office as opposed to

24      yours?

25  A.  They showed up and he asked me to come over to listen

1          to what they had to say.

2     Q.   Okay.  So they came to his office --

3     A.   Yes.

4     Q.   -- without an appointment?

5     A.   Yes.

6     Q.   Did he take notes at that conversation?

7     A.   No.

8     Q.   Did you take notes?

9     A.   No.

10    Q.   Is that a deviation from your habit not to take notes?

11    A.   I wasn't in my office, so I did not take notes.

12    Q.   If you were in your office, would it have been your

13         custom to take notes?

14    A.   I may have taken some copious notes, yes.

15    Q.   In the updated answers to interrogatories, have you

16         had a chance to review these?

17    A.   I looked through them, yes.

18    Q.   It talks about how ████████████ came with another

19         girl.

20    A.   Uh-huh.

21    Q.   You didn't remember this girl's name?

22    A.   No.  She's blonde is all I remember.

23    Q.   Was she also a student?

24    A.   Yes.

25    Q.   Was she also a freshman?

1  A.  I don't remember that at all.

2  Q.  What information did this blonde student say, as

3      specific as you can?

4  A.  She was there to support ████ from what I remember,

5      just that she sat there most of the time.

6  Q.  Did she allege that she also had been a victim of any

7      assaults?

8  A.  I don't remember that at all, no.

9  Q.  Did she state that she was a potential witness?

10  A.  Who is she?

11  Q.  The blonde student, I'm sorry.

12  A.  I think she would be a witness for ████ .

13  Q.  Right.

14  A.  That's the only reason I can think she would have been

15      there, just support for her if she knew something that

16      ████ was telling us about.

17  Q.  Sometimes -- well, strike that.

18          I'm trying to flush out was she there in a

19      supportive role or as a witness role, like I saw

20      something or I know something?

21  A.  She was more supportive.

22  Q.  Did you speak with her?

23  A.  I remember talking to both women that they were

24      sitting there just in general talking to them.

25  Q.  What specifically as close to verbatim as you can?

1  A.  It's been a long time.

2  Q.  Years after the time tell me what you said.

3  A.  I would have said tell me what's going on here.  And

4      they would have said what -- that Andrew Bruce had

5      done some things and they wanted to let us know.

6  Q.  Okay.

7  A.  I said -- I would have said will you write this down?

8      This could be helpful.

9  Q.  What did they do in response?

10 A.  They did not write anything down.  They ultimately

11     both transferred, I guess.

12 Q.  Did they refuse to on the site or did they leave it

13     like we'll think about it?

14 A.  More of we will think about it.  They did not write

15     anything in Jonathan's office.

16 Q.  Do you know if Mr. Rink knows who this blonde student

17     was?

18 A.  He may.

19 Q.  Have you asked him?

20 A.  No, I have not.

21 Q.  The e-mail that has been produced, there's an e-mail

22     from ▓▓▓▓▓▓▓ to you dated May 4, 2015?

23 A.  Yes.

24 Q.  She is stating that she wanted to finalize a meeting

25     time with you to discuss the grievance she

1    Q.  To you personally, by the way, I've been a victim of

2        sexual assault?

3    A.  I was assaulted at some point.

4    Q.  Okay.  And that was --

5    A.  Does that mean that that's everybody?  I don't know

6        how many that Dawn has since that time, since she

7        started.  I only recall two that I can be sure of.

8    Q.  Since the fall of 2014, to your knowledge, how many

9        students have made reports of being sexually

10       assaulted?

11   A.  I really have no idea.  I mean, I know the ones that I

12       wind up having to deal with since that time, but I

13       don't know what the actual number is based on Clery

14       data or what Dawn Floyd either currently or has worked

15       on.

16   Q.  Understood.  How many have you worked on that you have

17       knowledge of your own self since 2014?

18   A.  Of those that I had to work on which probably means

19       that two was too little because I didn't count ███████

20       ██████ in this number.  So I know I've worked on at

21       least three.  That I know of, like I say, that would

22       be include ██████'s allegation but because she never

23       put anything in writing and the person she was

24       alleging against was already gone from school.  So

25       there wasn't much to do on that other than thank you,

```
 1        students, frankly.
 2   Q.   I don't know how much of an opportunity you've had to
 3        review some of the affidavits or allegations my client
 4        has made?
 5   A.   Nope.  None.
 6   Q.   My client's mother, Janet ████████, she has represented
 7        that you had informed her that Andrew Bruce had
 8        assaulted two other girls before ██████ was assaulted?
 9   A.   Okay.
10   Q.   Do you dispute --
11   A.   Yes, I do.
12   Q.   Do you dispute that?
13   A.   Yes, I do.
14   Q.   So you deny that you told her he had assaulted two
15        other women?
16   A.   If I said that, it was well after he was already gone
17        from school.  I would not have known that because I
18        did not know anybody else had ever been assaulted by
19        Andrew Bruce until the ████████████ conversation.
20   Q.   Okay.  So until after he had been removed, you only
21        knew of ██████?
22   A.   Yes.
23   Q.   But as we sit here today, you know of two more?
24   A.   Now I know of others, yeah.
25   Q.   Others, okay.  Is it two?  Three?
```

1  A.  Two.

2  Q.  ████████████ is one.

3  A.  And ██████████ is one.  Those are the only two

4      times I know anybody has alleged that he's done

5      something.

6  Q.  Okay.  █████████████ also testified yesterday, I'll

7      represent to you, these aren't going to be her exact

8      words.  You had told her once in the office that he

9      had previously assaulted two people.  Do you dispute

10     that as well?

11 A.  I would have told her that after he was removed.

12     Because -- and the reason I would have had ████████

13     ████████ ultimately write things down, he was suspended

14     for one year.  If I had a second allegation that I

15     could corroborate, I may could keep him from ever

16     return to Lenoir-Rhyne.  So if I told her that, it

17     would have been afterwards because I did not know

18     until after ██████████████ came forward to say anything

19     about an allegation.

20 Q.  Has he attempted to return to Lenoir-Rhyne?

21 A.  No, he has not.  He attempted to go to another school.

22 Q.  One other thing, I just -- I might have asked this and

23     missed it or I don't remember or I might have asked it

24     in a different way.  But I just do want to find out,

25     the policies for students living in the campus